In the case of United States v. Kalatehe, I think that's the way to pronounce it, but I'm not positive. Actually, Your Honor, it is Kalatehe. Okay. Kalatehe. Okay, very well. Good morning, Your Honor. I believe you, oh, your counsel, oh, there he is. Okay, he's all set. So, please proceed. Yes. Good morning, Your Honors. Andrea St. Julian on behalf of the appellant Ebrahim Kalatehe. So, the two searches that are at the source of this appeal are both a product of one decision by the Burbank Police Department. And that was the decision to follow Mr. Kalatehe as he left his apartment building. There was nothing unusual about his behavior. It was 3 o'clock in the afternoon, and Mr. Kalatehe carried absolutely nothing with him as he left his apartment, got into his own car, and drove off. But, counsel, can't we consider the rest of the factual circumstances that the police were surveilling the co-defendant, who was seen going to that building on his way to a planned drug transaction? You can consider it, but even when considering it, it doesn't give, it did not support a decision to follow Mr. Kalatehe. Mr. Kalatehe, the surveillance of Mr. Chabot ended at the parking lot of the apartment building. No one followed him into the apartment building. They had no idea where he went. Mr. Kalatehe came out of the building approximately 13 minutes after Mr. Chabot left the building. Again, it was the middle of the afternoon. He was carrying nothing. He was not, he didn't even fit the description of what Mr. Chabot, of how Mr. Chabot had described his partner, which was he described him as a Mexican. Mr. Kalatehe is Iranian. There was, and also, you know, case law is clear that a mere temporal connection is not sufficient, and that was all they had. So Mr. Chabot went to the apartment complex and left and was observed carrying a bag that appeared to be heavy or laden with something and communicated with the agent and said that his source didn't want him to take the entire amount of the drugs and would meet them or was going to bring more. And then shortly thereafter, Mr. Kalatehe leaves the apartment building. So couldn't the police have followed anyone who left the apartment complex in that time period? No, because it would only have been a temporal connection, and a temporal connection is simply not enough to support probable cause of reasonable suspicion. It simply is not enough. Heaven forbid, you know, an innocent bystander who would happen to leave his or her apartment be followed, pursued, chased by police. We don't allow that. There has to be more than merely a temporal connection. And again, the temporal connection was 13 minutes. It wasn't that close. Well, maybe there needs to be more before stopping somebody, reasonable suspicion for the stop and then subsequently for the arrest. But more happened in between the time that the officers surveilled Mr. Kalatehe and the time that he was stopped, right? I mean, the erratic driving, fleeing, hitting a police car. I mean, didn't that give them all reasonable suspicion to stop him and question him and then ultimately arrest him? No, because they are all fruit of the poisonous tree. The inception was they had no reasonable suspicion, no probable cause to follow him. It was the following that caused all of the subsequent actions. If the following was wrong, you can't look at anything else after that. But counsel, with respect, my colleagues raised the issue of why your client was carrying the bag. There have been some references, if you will, that he might be involved in drug dealing. Why couldn't they follow him? Oh, no. My client was not carrying the bag. My client is Mr. Kalatehe. The person who was carrying the bag was Mr. Chabot. My client carried absolutely nothing with him as he went to the car. There is nothing about his demeanor as he walked out of his apartment building and went to his car that would lead anyone to believe that he was the source. He carried nothing with him. Okay, let's say that's true. He gets in the car. Obviously, police can follow people. They don't do anything. But if they're following him and then he starts speeding, reckless driving, eventually have the collision, isn't that in and of itself a basis for probable cause? No, Your Honor, because it is all fruit of the poisonous tree. The decision to follow him is very clearly laid out by Detective Merakian. He said that his decision, he ordered the officers to follow Mr. Kalatehe because of information he received from Detective Chang. And that information was derived from a 2015 investigation. I would say the questions by the court fail to acknowledge the specific statements by Detective Merakian as to why he ordered his police officers to follow Mr. Kalatehe. He says it. And not only does he say that his decision was based on the 2015 information, the district court even makes that finding in its denials of the motion to suppress and the denial of the motion to compel. So why is that problematic? As I read your argument, it seemed that you were suggesting that because Mr. Kalatehe was not ultimately arrested or charged after being observed engaging in two controlled drug transactions, there must have been something illegal about that investigation. Do you have anything more specific about why the 2015 investigation was illegal? Well, I will say there are several reasons why all of the information from the 2015 investigation was improperly used. One, it was stale. It was over four years old at the time it was used. It was stale and should not have been used at all. Also, it was based on unreliable information. There is some reference to a confidential informant. That is problematic. And then finally, there is also the illegal conduct of using the information gathered by the 2015 pen register without having gotten an order with respect to Mr. Kalatehe. All three of those things render the use of the 2015 information inappropriate. And also, I would like to point out one thing. We've got a police report written by Detective Merakian, and we also have his declaration attached to one of the oppositions to the motion. Where are the declarations from Agent Sear and Agent Chang, the ones who actually saw all of this in the first place? If that doesn't scream that there is something going on here, I don't know what else does. Detective Merakian is doing nothing more than giving some vague references to the 2015 investigation that Detective Chang did, and perhaps some statements by Sear, which do not... Again, the statements by Sear were not even the basis for the decision to follow Mr. Kalatehe. So you referenced the pen register, and it seemed a little unclear in your briefing whether you were arguing that, in fact, there was a wiretap from Georgia, or whether it was a pen register. Do you acknowledge now that we're talking about a pen register? No, I acknowledge that the government claims that it is a pen register. Do you have any evidence that there was a wiretap, other than the reference in the letter that the government says was mistaken? I would say that that letter is a pretty strong reference that there was a wiretap. It says the District Court of Georgia said it was a wiretap. This is the problem that I think is rife throughout two things that are rife throughout this case. One, the questions put forward by the court basically require Mr. Kalatehe to come up with information that only the government has. But at the same time, the district court did not compel the government to produce the information that would answer any of these questions. Well, if the information doesn't exist, what is the government supposed to produce? I mean, if they respond and say that it doesn't exist, or they respond and make a representation as officers of the court that it's a pen register, not a wiretap, was the district court just supposed to assume they were lying, that they are committing ethical violations and should be disbarred? No, no one has claimed that the information does not exist. It does, in fact, exist. Mr. Kalatehe asked for the documents underlying the Georgia letter. We know those documents exist. The letter itself says that there were warrants. We're asking for those, so we know that exists. Well, I think what they're saying, there's a difference. A pen register just captures numbers. A wiretap captures substance and discussions. And I think what the government said is there are no conversations because there was no wiretap, it was a pen register. And that really is a distinction without a distinction, a distinction without a difference. Really? So what did they possibly learn that they used from the pen register listing a phone number that could be the same as captured discussion about, for example, drug dealing? They learned Mr. Kalatehe's identity. And that is extremely important. And they did certain, based certain information just on knowing his identity. As Mr. Meraki states, he did a search of where Mr. Kalatehe lived and did a search of what his vehicle was. And those two- Counsel, so I guess I'm a little confused. I thought in your initial response to Judge Beatty's initial questioning was, no, we still think it very well could be a wiretap. But now I think you're saying, you're basically kind of acknowledging that it seems like it was a pen register, but that's still problematic. Which one is your argument, or is it both? No, no, no, it is both. Your Honor, without the documents that Mr. Kalatehe sought to compel, the only thing I have to argue on is the district court's, the Georgia district court's letter that says there was a wiretap. And I am saying, and so I'm making both arguments. Okay, okay, that's fine, that's fine. I still believe there's a wiretap, but even if there wasn't, the pen register is still problematic. Okay, your time is up. Let me ask whether either of my colleagues has questions. No, thank you. Very well. Thank you very much. Let's hear from the government. Good morning, Your Honors. May it please the Court. Good morning. I'm Alden for the United States. I want to start with the suppression issues, the way my colleague did on the other side. And I think Judge Beatty hit an important legal point on the head, which is that officers do not need reasonable suspicion to follow anybody. They needed reasonable suspicion to conduct a traffic stop. And they had that reasonable suspicion. And then they had probable cause to conduct a warrantless search of the defendant's car. That was based on a number of things. First, they knew about the investigation of Chavall. Counsel, can I ask you sort of a predicate question? So I think that's right. Does it change the analysis if somehow they were following them because, you know, I think your opposing counsel's argument is the fruit of the poisonous tree, that, you know, this whole thing was tainted. Putting aside the factual basis for that, let's assume that it was tainted if the reason that they were following was some impermissible reason. Does that change the argument? Like if you're following somebody for an impermissible reason but then they start driving erratically, is there ‑‑ I'm trying to figure out. I don't know if I've seen cases applying the brown fact, the attenuation doctrine in that circumstance. I would say if there was a poisonous tree, which I don't concede that there was here, and that had led them to begin following him, then we would apply the attenuation factors and that the court has applied them in circumstances where a defendant tries to evade the police and those sorts of intervening circumstances like the speeding here, the reckless driving, the crashing into a police car would be enough to apply the attenuation doctrine. I do think, though, there is nothing in the record to suggest that there was a poisonous tree to begin with because the 2015 investigation was not problematic in any way. The defense counsel points out that 2015 was four years old. That is not enough. This court has said that the mere passage even of substantial amounts of time does not constitute staleness, and that's particularly so where the identical crime was what was being investigated in 2015 as what was being investigated in 2019. Defense counsel has also pointed out that the 2015 investigation involved an undercover informant. Again, that is not problematic in any way. Obviously, many investigations involve undercover informants, and the mere fact that no charges were filed in 2015 is also not evidence of anything wrong with that investigation. So I would say once you take that 2015 investigation and you couple it with the circumstances surrounding Chabal, the fact that they knew Kalate or Kalate was living in this apartment complex from 2015, and they even knew that this car was registered to him, and they knew that Chabal was working on this deal with his supplier who was going to provide some of the opium for the transaction, and as counsel pointed out, they knew that Kalate left 13 minutes, merely 13 minutes from the same apartment complex after the defendant — sorry, after Chabal is carrying the bag full of kilos of opium, all of those circumstances together alone would have constituted reasonable suspicion and probable cause to search defendant's car. What about the wiretap or pen register from Georgia? Why should we conclude that it was a pen register? And I believe your opposing counsel was suggesting that even if it were just a pen register and a phone number was obtained, that it was illegal for the police to take that information and use it to track Mr. Kalate. So, Your Honor, I think you hit on the exactly right points during counsel's argument, which is that there was nothing more the government could have done or said. The AUSA who prosecuted this case in the district court called up the Northern District of Georgia, asked what this was, and represented to the district court that, indeed, it was a pen register, that, as Your Honor pointed out, all the pen register captures is the numbers that the target phone in Georgia calls, and the district court accepted that representation. So that representation was made and accepted at ER 72 to 73 and 81 to 82, where the district court said the claims regarding a wiretap were mere speculation, the government had made its representation that there was no wiretap communication, and the defendant has pointed to nothing about the mere fact of his number being on the pen register in the 2015 investigation that could have even linked that to what was happening in California. And I need to be clear that there is the 2015 Georgia pen register and the 2015 California investigation that are separate. There's nothing even linking those two, and the representation that that is how they discovered defendants' identity in 2015 is false. They were conducting an undercover operation in 2015 with an informant in the Central District of California through which they knew this defendant's identity. So there's simply no taint there. Counsel, since there is obviously a factual dispute between you and your opposing counsel, what standard of review do we apply to the factual findings in this matter for purposes of a Brady decision? The findings would still be reviewed for clear error. If the defendant had made a claim on appeal that there had to be an evidentiary hearing, that would be abuse of discretion. But that's not a separate claim that's actually raised on this appeal. There is no claim that the district court abused its discretion by declining to hold an evidentiary hearing. So was this a waiver on their part, basically? To the extent they're arguing now that there should have been an evidentiary hearing, that's waived. To the extent they're arguing that the factual findings were clearly erroneous, they simply were not. That is a very high standard, illogical, implausible, or unsupported by inferences in the record, and they are supported. The government made its representations to the district court, and the district court accepted those representations about what happened. The government turned over everything in its possession, including the police reports about the 2015 investigation and all of the information about this other person, Bukagi, who the defendant was speculating about. The government turned those over, too. The only thing that the government withheld was the pen register from the Northern District of Georgia. So that alone, not only was there no problem in withholding that because it was unrelated to this 2019 investigation, in fact, it was unrelated to the 2015 investigation in California, but it certainly didn't tip the scales or cause the defendant to plead guilty here. There were a few other points that I wanted to respond to in the defendant's arguments. The counsel said at one point that the District Court of Georgia said that there was a wiretap. That's incorrect. In fact, what happened was the AUSA in Georgia erroneously sent this notice, which the government then confirmed in California was in error and there was no wiretap at all. And I think then with that, that covers all of the suppression issues. It really covers the discovery issues, too. There was really nothing more to produce. So unless the court has other questions, I'm willing to see the rest of the time. I think not. Thank you. Thank you very much. Now, counsel, we took you over time a little bit, so we'll give you a minute for rebuttal. Thank you so much, Your Honor. I think one of the things that I would like the court to focus on is the shifting burden of proof. The initial search was a warrantless search. It is the government's burden to prove an exception. Similarly, because Mr. Kalatahaye brought forth primophagia evidence that the searches were the fruit of the poisonous tree, it is the government's burden to show that it is not. And again, the government really has failed to produce the evidence or failed to produce the evidence to show that. And I think, as I would like to also remind the court, there are no declarations from Agent Sear and Agent Chang. Okay? So we're talking about what they have said without the government actually producing that information. So what you're complaining about is the absence of those declarations attached to the application for the search warrant? Is that correct? Well, what I'm saying is that there was simply no—well, yes, but more broadly, I'm arguing that they simply didn't meet their burden of proof, and the burden of proof, unfortunately, kept inappropriately shifted below. So was the other agent who submitted a declaration and talked about statements from these other two agents, was he the lead case agent? He was—I'm not sure if he would be considered the lead case agent, because it depends on which case you're talking about. He—I believe he may have been the lead for the Burbank Police Department. And can't the government rely on hearsay when seeking a search warrant? Well, Your Honor, I think it was more than simply seeking a search warrant. Again, I'm not talking just about the search warrant itself, which was prepared—that affidavit was prepared by Agent Sear. I'm talking about the rebuttal to the motions to compel and motion to suppress, where they only used—relied on the declaration of Detective Jim Rocky. And they did not bring forward any declarations by Sear or Chang to answer any of the questions or answer any of the questions from the government's perspective that this court has asked. Other questions by my colleagues? Very well. Thank you, both counsel, for your argument. The case just argued is submitted. Thank you.
judges: SMITH, BADE, VANDYKE